The ADIRONDACK POWER AND LIGHT CORPORATION and Another, Plaintiffs, *v.* THE CITY OF LITTLE FALLS and Others, Defendants.

Supreme Court, Herkimer County, September 30, 1930.

*Snyder, Cristman & Snyder*, for the plaintiffs.

*James A. McTiernan* [*Robert F. Livingston* and *Nathan Matthews* of counsel], for the defendant city of Little Falls.

SMITH, EDWARD N., J. The action is brought by the plaintiffs, The Adirondack Power and Light Corporation and Daniel Green Felt Shoe Company, against the defendant the city of Little Falls, for an injunction restraining it from diverting the waters of tributaries of East Canada creek from the catchment area thereof to said city for its municipal water supply, and for damages caused said plaintiffs at their several water power plants by such diversion for a period commencing six years prior to the commencement of this action, or from February 1, 1917.

The East Canada creek empties into the Mohawk river some six and one-half miles easterly of the city of Little Falls; its sources are in the Adirondack Mountains; it has a catchment area of 257 square miles at Dolgeville, N. Y., of 278 square miles at the Ingham's Mills plant of the plaintiff The Adirondack Power and Light Corporation, and of 282 square miles at the Beardslee Falls plant of said corporation; its mean flow is about 600 cubic feet per second, as appears from the official records of stream flow taken at Dolgeville each day for a period of nineteen years; it is what is known as a " flashy " stream, with a rapid run off. The mean daily flow for the nineteen-year period fluctuates from 234 cubic feet per second in August to 1,883 cubic feet per second in April. The months of

heavy flow are the months of March, 951 cubic feet per second; April, 1,883 cubic feet per second, and May, 703 cubic feet per second. No other month excepting December reaches a flow above 500 cubic feet per second; and, excluding the months of March, April and May, the mean flow is 408.8 cubic feet per second.

One of the principal tributaries of East Canada creek is Spruce creek, which empties into it a short distance above the village of Dolgeville. Spruce creek at its junction with East Canada creek has a catchment area of 52 square miles, and at what is known herein as Eaton pond dam has a catchment area of 36.2 square miles, or, as agreed, one-seventh of the catchment area of East Canada creek at Dolgeville. The mean flow at Eaton pond dam is 83.9 cubic feet per second.

Beaver brook is a tributary of Spruce creek and has a catchment area above the dam erected by the defendant city of 5.1 square miles. Tributary are two springs, known as King's springs, which have a flow of between 400,000 and 1,000,000 gallons per day, which in a state of nature entered said brook below said dam.

In or about the year 1888 the defendant city (then village) of Little Falls entered upon a project for the acquisition of a municipal water supply, and on Beaver brook, at a point above the junction of the King's springs flow with it, purchased some land, built a small dam six feet high, with an impounding area of 60 feet by 120 feet, and built a pipe line running therefrom a distance of some nine miles to a distributing reservoir located on the heights above the village, through which pipe it drew the water of Beaver creek to its distributing reservoir from which the municipality and its inhabitants are supplied with water. The capacity of the pipe line, as originally constructed, was 3,000,000 gallons of water per day. In the year 1897 or 1898 it connected its pipe line with Spruce creek at Eaton pond dam site, where it constructed a concrete dam and a filter bed, the latter having been completed in the year 1899. Later, and in about the year 1908, it connected with its pipe line the flow from the King's springs. In the year 1907 there were certain structural changes made in the pipe line, the result of which was that the capacity of the line was increased so that it since then delivers to the distributing reservoir 4,100,000 gallons of water per day, which it has been agreed upon has been the amount of diversion during all the period involved in this action. This amounts to 1,496,500,000 gallons per annum, or to 6.3 cubic feet per second. This is a trifling quantity of water, and were it not for the tremendous head at which the waters of East Canada creek are used by The Adirondack Power and Light Corporation at its hydro-electric plants thereon, as will hereafter appear, might be considered de minimis;

but when converted into horse power at the heads at which it can be used if available, this amount of diversion causes a very considerable damage to the plaintiff The Adirondack Power and Light Corporation. It is to restrain this diversion and to recover damages on account thereof that this action is brought.

Neither the defendant city nor its predecessor village of Little Falls had and never claimed that it had any right without condemnation or grant to divert the waters of East Canada creek from its natural catchment area. Every riparian owner has the right to have the water of a stream flow past his premises in the stream as it is wont to flow, without diminution and without increase of the natural flow or obstruction thereto; this of course subject to the use of water by those above for domestic purposes, for the use of cattle, and for the proper use, within limits as to obstruction of flow, for power purposes. Of course the defendant the city of Little Falls and its predecessor had a paramount right through condemnation to acquire the right to the use of water for municipal water supply, upon paying fair compensation to those who might be injured by the diversion of the water for municipal purposes; it at no time has had any other conception of its rights.

The defendant city has acquired no right by prescription. There is no possible basis here for the presumption of a grant. The whole conduct of the city, as shown by its own municipal records (its institution of condemnation proceedings never completed, its filing of maps of its plans in the Herkimer county clerk's office, its acquisition from time to time by grant of rights to divert from a few of the many riparian owners, its recognition from the very beginning that any diversion must be compensated for by storage reservoirs), negatives any such presumption or any adverse claim of right. Its much-advertised purpose to construct adequate reservoirs and its actual conduct in that respect may have had the effect of lulling to sleep riparian owners who in the event of such construction would be actually benefited and suffer no damage by reason of the diversion for municipal water supply.

The original plans for its water works system, including the supply, were prepared under the supervision of or by a very able hydraulic engineer, Stephen E. Babcock, now deceased, who was or became the engineer for the city. His plan was based upon the proposition that by storing up, by storage reservoirs, storm or flood waters there would be impounded waters from waste or useless waters sufficient in amount to compensate for the draft for the uses of the village; that under those circumstances the diversion of the water would cause no damage, but that by storage reservoirs actual benefit, through the holding back of the waters during the flood water period,

would accrue to the riparian owners. From time to time the defendant city of Little Falls has prepared for, but has never prosecuted to the end, condemnation proceedings; on the contrary, as occasion has arisen, it has from time to time acquired by purchase from riparian owners rights of diversion and contracted to construct and maintain storage reservoirs. It has apparently followed a line of least resistance.

The plaintiff The Adirondack Power and Light Corporation is the owner of two hydro-electric power plants; one known as the Ingham's Mills plant, situated about three and one-half miles below the dam of the plaintiff Daniel Green Felt Shoe Company at Dolgeville, and the other, known as the Beardslee Falls plant, located about two and one-half miles below its Ingham's Mills plant. At Beardslee Falls there had been constructed by its predecessors, as early as 1896, a hydro-electric plant with a head of 60 feet; this head was increased by new development, more than six years prior to the commencement of this action, to 115 feet without flashboards and 118 feet with flashboards; after the commencement of this action and on the 15th of August, 1924, the head was increased to 154 feet without and 157 feet with flashboards. The said plaintiff's Ingham's Mills plant was constructed in 1912, with a head of 122 feet without and 125 feet with flashboards. This head united several water power sites in a single development. The plaintiff The Adirondack Power and Light Corporation has owned and operated these plants during all the period of time involved in this action.

The most important and for the purposes of this action the only of the grants which will receive consideration was the deed of Alfred Dolge and wife to the city of Little Falls, dated May 29, 1897, and recorded in the Herkimer county clerk's office June 4, 1897, in book of Deeds 163, at page 188. There was one other acquisition of a right by virtue of a decree entered in an action wherein Helen C. Beardslee, Guy R. Beardslee and the East Creek Electric Light and Power Company were plaintiffs and the city of Little Falls defendant, on the 9th day of June, 1905.

Alfred Dolge, of Dolgeville, was at the time of said grant the largest owner of developed water powers upon East Canada creek, and also was the largest owner of water power sites undeveloped; he also owned the Eaton pond dam site on Spruce creek, and many acres of land above it; he owned the water power now owned by the plaintiff Daniel Green Felt Shoe Company; he owned the undeveloped and planned the development of the water power known as High Falls in the village of Dolgeville, now owned by the defendant Utica Gas and Electric Company, and also owned the water power

in said village now owned by the defendant Julius Breckwoldt & Company; his total holdings in said village alone had an aggregate head of about 155 feet in their natural state; he owned other hydraulic property on East Canada creek below High Falls, arising generally from the ownership of one bank of the stream, with several power sites thereon, which are now comprised in the property owned by the plaintiff The Adirondack Power and Light Corporation and known as the Ingham's Mills plant. He was an able and far-sighted man and looked forward to the ultimate development to their fullest capacity of the water power possibilities on the East Canada creek catchment area, and was particularly interested in the possibilities of storage of water at and above the Eaton pond dam.

On the 22d of September, 1895, the city of Little Falls acquired from David H. Burrell and others 600 acres of land above and below Eaton pond, including what is known as the westerly channel of Spruce creek above Eaton pond, the effect of which was to negative the plans and purposes of Alfred Dolge in reference to storage reservoirs for regulatory purposes on his lands at and above Eaton pond, excepting in co-operation with the city of Little Falls. Mr. Dolge was unwilling to allow the diversion by the defendant city of Little Falls from the catchment area in which he was so deeply interested to continue; he made claim against the city of Little Falls for damages caused by the city's diversion of waters for municipal water supply, with the result that negotiations were had which terminated in the deed of May 29, 1897. The plaintiff Daniel Green Felt Shoe Company and the defendants Utica Gas and Electric Company and Julius Breckwoldt & Company entirely and in considerable measure the plaintiff The Adirondack Power and Light Corporation are the direct successors in title to the properties on East Canada creek which were at the time of the grant of May 29, 1897, owned by Mr. Dolge.

With a knowledge of the physical facts and of the conditions of the title at the time of the grant, the interpretation of its numerous provisions is not difficult, but is important. It was clearly intended to settle for all time the rights of the parties. The instrument is made up of grants of lands and of rights and of covenants to be performed. For a consideration of $5,000 Mr. Dolge conveys to the city 114 acres of his land at or about Eaton pond. He then conveys the right and privilege to dam, hold and store the waters of Spruce creek and also the waters of Fly creek and Kettle Meadow creek, tributaries to said Spruce creek, upon any and all lands which he owned or had any interest in upon lots Nos. 3, 4 and 26, Jerseyfield Patent, in the town of Salisbury, N. Y., " *in such manner and in such quantities as to its officers and agents shall seem best and desirable;*

*and also to locate such dam or dams at such points in said creeks, or either of them, as shall seem useful to the party of the second part, its successors or assigns, with the right to change location thereof from time to time until the same shall be permanently located as hereinafter provided, and the right to locate in the vicinity of such dam or dams such bulkheads, piers, abutments, inlets, gates or other devices as shall be necessary or desirable for the purposes aforesaid, and also to draw the waters from such dam or dams at the time and in the quantity and manner said party of the second part, its officers and servants or successors, may elect.*" He also granted rights of ingress and egress to and from such streams, dams, etc., " which said party of the second part shall or may erect;" the right to cut and fell trees and otherwise clear the lands to be overflowed in the aforesaid lots, reserving the right to the ownership of the timber cut. It will be noted that in this clause there was granted no right to divert any water, but simply the right to take, hold, store and draw the waters of Spruce creek in such manner and in such quantities as might seem best to the city.

The grant further provides and the city agrees that it will " within one and one-half years from the date of this instrument, permanently locate the proposed dams and determine the flow lines of the proposed reservoirs on said lands in lots numbers three, four and twenty-six in Jerseyfield Patent, above mentioned and referred to, and make maps and profiles thereof, and deliver copies of the same to parties of the first part, and also by and through its board of public works or other proper authority make and execute in due and legal form an instrument in writing locating said dams and defining said flow lines, *which instrument may be filed and recorded and the same shall be taken as part of or supplementary to this conveyance. And thereafter the location of said dam or dams shall not be changed.*" This the city did within the time prescribed.

The fourth paragraph of the instrument grants to the city " the right and privilege to divert the waters of Spruce Creek at any point in said Creek, or the branches thereof, above the westerly line of the so-called ' Mill Lot,' * * * to the extent which the said water may be required or used as a public supply of water to the City of Little Falls and its inhabitants and for that purpose only."

Then follows the following herein important provision: " This conveyance and grant is made with and subject to the following restrictions, reservations, covenants and conditions:

" *First*. Party of the second part covenants and agrees with parties of the first part, as part of the consideration for this conveyance, that it will at all times maintain *the normal and natural flow of water (exclusive of storm water) in Spruce Creek* below the

point where party of the second part shall take water therefrom for the purposes aforesaid, it being the intention of the parties hereto that party of the second part shall replace and return to the channel of said stream, *below the point of such taking an amount of water from the waters stored above that point on said Spruce Creek and its tributaries at least equal to the amount diverted* by it for the purposes of affording such public supply of water to the City of Little Falls and its inhabitants."

This covenant, excepting in so far as it forms a part of the consideration of the grant, is an independent covenant, unrelated to the grant itself, and comprehends all the diversion which the city of Little Falls may make from Spruce creek for the purposes of its municipal water supply. There is no limitation here that it shall take any water for its municipal supply above the westerly line of the so-called mill lot; there is no restriction anywhere as to the point at which the diversion shall be made. The parties were dealing with the facts as they were, with the only diversion at the time being made from Beaver brook, and with no obligation upon the city to take the water from any other point; but there was an obligation imposed upon the city to maintain " the normal and natural flow of water (exclusive of storm water)," which only could be done through the maintenance of adequate storage reservoirs.

An illuminating clause of the grant follows: " It is further agreed that the party of the second part will at any and all times of low water, at the request of parties of the first part, or their heirs or assigns or otherwise discharge all the surplus waters so stored above the points of such taking, *over and above such amount as shall be reasonably necessary for the purpose of providing a public supply of water* to the City of Little Falls and its inhabitants, *and also for the purpose of maintaining such normal and natural flow of water in said stream as above provided,* through, under and over the several dams erected or to be erected upon the lands or premises the right to flow which is hereby granted; but nothing herein contained shall be construed as requiring party of the second part to discharge or permit to be discharged a greater amount of water at any time than can be legally discharged through said streams upon the premises and water privileges and rights lying below said points."

The clear purpose of the grant is that the city of Little Falls shall have the right to take its municipal water supply from the catchment area of Spruce creek, but in such a manner as not to interfere with " the normal and natural flow of water (exclusive of storm water) " of Spruce creek; that it shall be privileged to take its water continuously in such quantities as it may require, without limit in amount, provided it does not interfere with such normal and natural

flow. The only way in which this could be done would be through the construction, maintenance and proper operation of regulatory reservoirs; the right to maintain the same, so far as his lands were concerned, Mr. Dolge had granted. The city was granted the right of diversion, in return for which it incurred certain obligations.

In the record effort has been made to define and determine what is meant by the word " normal " and by the word " natural " as applied to the word " flow," and, in that connection, the words " storm water." It is obvious that the city incurred no obligation excepting on account and to the extent of the water diverted by it; it was obligated to maintain the normal and natural flow of Spruce creek exclusive below the point of diversion during the periods when the stream was not affected by storm water; and the inquiry that we are called upon now to make is as to the nature and extent of its obligation in this respect. The limit of its obligation is the extent of its interference with the normal and natural flow; therefore, the minimum of the city's obligation is to construct, maintain and operate reservoirs of such size and capacity as to be able to deliver to the stream, during the periods when the flow of the stream is not affected by storm water, the amount of water which it diverts, to wit, 4,100,000 gallons per day, or 6.3 cubic feet per second. These reservoirs must be of sufficient capacity to do this, taking into consideration evaporation, and also the amount of the normal and natural flow at the point where the reservoir dam is constructed. There will of course be a watershed or catchment area above the site of the reservoir dam, and that watershed has its normal and natural flow at the reservoir dam. This flow the city cannot interrupt, and the reservoirs to be built were to impound storm water and be sufficient to take care of its diversion after allowing without interruption the flow to the extent of the normal and natural flow of the catchment area above such reservoir dam, exclusive of storm waters. Only in this way could it compensate for the damage which it does by reason of diversion. Such is the meaning of the covenants of the Dolge grant, and such is the duty of the defendant city. These covenants are not personal with Mr. Dolge, but run with the land, and against them no prescriptive period has ever run and I doubt whether it ever would commence to run; certainly not as to Alfred Dolge and his grantees. (*McCann* v. *Chasm Power Co.*, 211 N. Y. 301.)

The duty of the city is clear to make ample, not niggardly, provision for the fulfillment of its covenants; and when it does fully comply with the terms of the covenants of this grant it will have for all time ended the claims of damage on the part of other riparian owners not parties to this action, for the reason that after so doing

it will not have injured any owner of riparian rights, and, upon the performance of these covenants by the city, no court of equity would interfere on behalf of any riparian owner, because, no matter if there were technical violation of the law of riparian rights, it would relegate its petitioner to his legal rights, and, under such circumstances, he could prove no damage; and the city, by so doing, will have avoided vast — and now, by reason of this grant, unnecessary — expenditure by way of condemnation proceedings. The city acquired from Mr. Dolge valuable rights.

It remains to define in practical terms the meaning of the words " normal and natural flow (exclusive of storm water)."

In view of the nature of the catchment area of East Canada creek and of its tributaries, and particularly of the fact that East Canada creek and its tributary Spruce creek are streams of rapid run off, with a precipitous watershed and heavy falls, it is not unreasonable to assume that the parties understood as " storm water " that water that ran promptly off the surface into the stream after storms. Of course, actually, all the water of the flow of the stream is made up of storm water, because, whether denominated " ground water," " surface water," or " storm water," all the water comes ultimately from the heavens by precipitation in rain or snow storms. The parties had in mind that the diversion for municipal water supply was to be compensated for out of the storm water flows of the stream, which were so great that they were not available for useful purposes. Such flows, instead of being helpful, constituted an interference with a proper use of the waters of the stream for power purposes.

The " normal flow " means that flow of Spruce creek which is not affected by what is called " storm water." Broadly speaking, storm water includes the freshet flows of the spring months brought about through the melting of the snows, spring rains, and also the flows following upon heavy rains in other months, in so far as they suddenly and temporarily raise the flow of the stream above the normal flow. Practically speaking, from a study of the official data showing the flows by months for a period of nineteen years, the storm water flow period should be limited to the months of March, April and May. There is ample storm water during these months to provide for any possible diversion by the city of Little Falls. During these months there is a practical certainty of storm water. There are other months of the year when on occasion there may be what is known as storm water, but such occasions are not capable of definite determination. " Natural flow " is the flow of the stream unaffected by artificial conditions. A storage reservoir necessarily works an interference with the natural flow and in so far subjects the stream to artificial control. Effect must be given to both these words

" normal " and " natural " flow. A vast amount of evidence has been introduced to show that " normal and natural flow (exclusive of storm water) " is the storm water flow which is not, from the power owners' standpoint, capable of being economically used for power purposes. Evidence along this line has some value as an aid in reaching a determination of the water to be treated as storm water, but can scarcely be adopted as the measure of " storm water."

The intent of the provision under consideration was that, while it authorized the city to divert the water of Spruce creek for municipal purposes, the city was not to interfere with the " normal and natural flow " of the stream " (exclusive of storm water)," and was by such non-interference to suffer such " normal and natural flow (exclusive of storm water)" to continue. " Maintain " is used in a passive rather than in an active sense. The other provisions of the grant, which must be read as a whole, negative the suggestion that the city of Little Falls assumed any obligation to regulate the flow of the stream so as to keep up an even flow equal to the " normal and natural flow (exclusive of storm water)." It was not, however, to interfere with such flow by the construction, maintenance or operation of reservoirs, and, therefore, in so far as it may maintain reservoirs to impound the storm waters, it must be prepared as a matter of legal duty to let flow out of such reservoirs at all times such quantity of water as will be equal to the normal and natural flow at such reservoirs, unaffected by storm water as above defined.

The deed speaks of " storm water " and also speaks of " points of diversion." Literally interpreted, it would lead to the conclusion that the city of Little Falls was actually to take the water used by the city out of storm water only. No such interpretation was in the minds of the parties. The city on its part was actually taking water at the time from Beaver brook, which water supply was later augmented by the use of the King's springs tributary to Beaver brook. There was no idea in the minds of the parties at the time of the grant that the city was required to take its water out of stored water. It was immaterial where the actual draft occurred; the thing that was material was that there should be no diversion of the water of the stream excepting that the amount of diversion was fully compensated for by storage reservoirs to impound from storm water sufficient to compensate for the diversion. This throws light upon the expression in the deed, " the point of diversion." Literally, it would be at Beaver brook dam; actually and practically, the point or points of diversion are at the various storage reservoirs, for, while the water is not actually drawn from the reservoirs for municipal purposes, these reservoirs were, according to the meaning

of the grant, the places where the water to be diverted was to be provided for. The city could build one reservoir or several reservoirs, and the point or points of diversion were where the storage reservoir or reservoirs might be built; there is withheld the storm water, and there the city must maintain the normal and natural flow, and from there it must also let down enough water to cover the diversion. Such was in the minds of the parties to the grant. So that it was to maintain at the point of diversion the normal and natural flow; and it does owe the obligation to maintain, out of stored waters but by proper contrivances, in any dams built for storing waters, the normal and natural flow at the point of diversion, as above defined. This is the city's obligation. As a matter of practice, and for the benefit of all parties, the city, in economic administration, and the water-power owners with benefit to themselves, might agree as to some other flow than what is here denominated and really is the "normal and natural flow (exclusive of storm water);" but that would be a matter of agreement in practical operation. Such a purpose is provided for in the Dolge deed and in the Beardslee decree, to which attention will later be called. The city is under no obligation to provide storage in order to maintain the normal and natural flow, but only to overcome its diversion; it must, however, make provision to let flow at all times down the stream, in spite of its interruption of the flow by a reservoir, the quantity of water which equals the normal and natural flow of the stream. In other words, it is impounding only from storm water flows, and not from normal flows.

Attention has been called to a clause in the grant which reserves to the grantors the right, during periods of low water, to call upon the city to let down practically all the water stored in the reservoirs, so that there is expressed in the grant the intention that the water impounded shall be used to supplement the normal flow during periods of low water; and, according to the capacity of the reservoirs, and subject of course to the municipal water supply, the reservoirs may be used, upon the demand of the grantors, for regulatory purposes.

It remains to translate the words of the grant, "normal and natural flow (exclusive of storm water)," into terms of cubic feet of water per second. A vast amount of evidence has been given in the case bearing upon this subject.

At the date of the Dolge deed there was no official information available as to the actual flow of East Canada creek. Since that time and for nineteen years, from 1899 to 1917, both inclusive, official records of the stream flow of East Canada creek have been maintained by the United States Geological Survey and the State of

New York for each day and month during each year of said nineteen years.

The mean flow of East Canada creek at Dolgeville, as shown by these records, is 600 cubic feet per second, and the only months which on the average, from the experience of these nineteen years, show an excess of the mean flow are the months of March, April and May. The average for March during these nineteen years is 931 cubic feet per second; for April, 1,883 cubic feet per second, and for May, 703 cubic feet per second. While it is true that there are other months in these years which on occasion show a flow in excess of the mean flow, these are so few and exceptional as to be unrelated to what possibly could have been in the minds of the parties when they spoke of storm water flows. The mean monthly flow for the nineteen-year period is as follows: January, 481 cubic feet per second; February, 459 cubic feet per second; March, 951 cubic feet per second; April, 1,883 cubic feet per second; May, 703 cubic feet per second; June, 453 cubic feet per second; July, 288 cubic feet per second; August, 234 cubic feet per second; September, 270 cubic feet per second; October, 462 cubic feet per second; November, 498 cubic feet per second; December, 536 cubic feet per second. By which it appears that, taking the long average, the only months in which the actual flow exceeds the mean flow are the months of March, April and May. On several occasions in March when the flow was below the mean the spring thaws came earlier and the February flows were excessive. It is impossible to secure absolute accuracy, and resort must, therefore, be had to the average covering a long period of years. By and large these few exceptions do not modify the conception of what must have been in the minds of the parties to the Dolge grant, to wit, that the storm water flows were those excessive flows above the mean which as a rule could be counted upon. To illustrate: The average flow for the nineteen years in the month of September is 270 cubic feet per second. The parties would hardly have had in mind the fact that in that month, in one year, the year 1905, there would be a flow of 1,191 cubic feet per second, or that in the month of October, when the average flow is 462 cubic feet per second, in the year 1903 the flow would have been 1,068 cubic feet per second. These are exceptional instances of deviation from the general experience. While it is true that there are occasional months outside of the months of March, April and May when there would be opportunity to hold back water in storage reservoirs, the sure dependence for such purpose must always be the months of March, April and May. Although I find the storm water period to be ninety-two days in each year, all of these ninety-two days are not concentrated in the

months of March, April and May. An examination of the official records of stream flow for which daily records are available shows that for the period of nineteen years the number of days when the flow of East Canada creek at Dolgeville exceeded the mean flow was slightly over ninety-one per year; and, using the average of the months during these nineteen years when there was a record for the days when there was no record, it gives an average of ninety-three days as the number of days in each year during that period that the flow was above the mean flow. This is fairly conclusive proof that ninety-two days is the period in each year when the flow of East Canada creek exceeds the mean flow.

I have, therefore, reached the conclusion, after considering all the testimony of the experts and the different theories propounded, based upon the data now available, and taking into consideration the usage of the stream at the time of the grant and then in prospect, and that there is an abundance of water for storage purposes during the storm water period (as will later appear, some four times the amount which ever could be required by the city of Little Falls for municipal purposes), and in view of the fact that there must be some definition, that what the parties actually had in mind as to storm water were those flows of the stream which were in excess of the mean flow of 600 cubic feet per second. All the experts seem to agree, and with this view I am in accord, that the balance of the flow after deducting what is storm water constitutes the normal flow of the stream. It has been agreed for the purposes of this trial that the run off from any area of the watershed of East Canada creek less than the whole thereof would be in the proportion of the number of square miles in a given area to the total square miles of the whole watershed above Dolgeville. The official stream-gauging was at High Falls, at Dolgeville, and above this point the total watershed of East Canada creek is 257 square miles. In view of the fact that for storage purposes on Spruce creek the sites available for such purposes are all at or above Eaton pond dam, only such part of the watershed of Spruce creek becomes of importance. The area of this part of the watershed is 36.2 square miles.

We have now to determine what is the normal flow exclusive of storm water at Eaton pond. The watershed above Eaton pond is one-seventh of the area of the watershed of East Canada creek above High Falls at Dolgeville; so that if we can determine what is the " normal and natural flow (exclusive of storm water) " at High Falls at Dolgeville, we will be able to determine such flow at Eaton pond dam. In order to determine such normal flow at Dolgeville, I have taken the mean flow of 600 cubic feet per second and have deducted from the total flow in each month in the nineteen years

the amount of the flows in any year for such month in excess of the mean 600 cubic feet per second and have subtracted such amounts from the total flow for such months for the nineteen years, and divided the total by nineteen, thereby reducing the normal flow exclusive of storm water for each month. To illustrate: The month of January for nineteen years gave a total flow of 9,131 cubic feet per second, with a mean monthly flow of 461 cubic feet per second. The years of excess and the amount of excess of the mean flow for the month of January are as follows:

| | |
|---|---|
| In 1899 | 216 cubic feet per second |
| In 1903 | 66 cubic feet per second |
| In 1907 | 487 cubic feet per second |
| In 1908 | 16 cubic feet per second |
| In 1916 | 90 cubic feet per second |
| Total | 875 cubic feet per second |

Deducting this 875 cubic feet per second from 9,131 cubic feet per second, leaves a balance of 8,256 cubic feet per second, which, divided by nineteen, gives the normal flow, exclusive of storm water, for January, 434 cubic feet per second. This process, carried through for all the months, results in the following table for each of the months of the year:

| | |
|---|---|
| January | 434 cubic feet per second |
| February | 372 cubic feet per second |
| March | 537 cubic feet per second |
| April | 597 cubic feet per second |
| May | 514 cubic feet per second |
| June | 409 cubic feet per second |
| July | 275 cubic feet per second |
| August | 229 cubic feet per second |
| September | 239 cubic feet per second |
| October | 391 cubic feet per second |
| November | 456 cubic feet per second |
| December | 421 cubic feet per second |
| Total | 4,874 cubic feet per second |

Or, for each year, the average normal flow exclusive of storm water (this total, 4,874, divided by 12, the number of months in each year) equals 406 cubic feet per second.

The mean normal flow, exclusive of storm water, at Eaton pond would be one-seventh of 406, or 58 cubic feet per second, distributed through the months as follows:

| | | |
|---|---|---|
| January | 62 | cubic feet per second |
| February | 53.14 | cubic feet per second |
| March | 76.71 | cubic feet per second |
| April | 85.28 | cubic feet per second |
| May | 73.43 | cubic feet per second |
| June | 58.43 | cubic feet per second |
| July | 39.29 | cubic feet per second |
| August | 32.70 | cubic feet per second |
| September | 34.10 | cubic feet per second |
| October | 55.86 | cubic feet per second |
| November | 65.23 | cubic feet per second |
| December | 60.14 | cubic feet per second |
| Total | 696.31 | cubic feet per second |

which, divided by 12, equals 58 cubic feet per second.

It is significant that, by another method than that pursued by the court, Mr. Allen Hazen, one of the engineers who testified in behalf of the city of Little Falls, after exhaustive research, reached the same conclusion as has the court. Mr. Hazen has since died. The court may be pardoned at this time for paying a slight tribute of respect to his memory. Truth alone was his object, and to the determination of what was the truth in a particular case he brought to bear a deep knowledge of hydraulic problems, especially those affecting municipal water supplies, his great natural abilities, and carried great weight by his candor and the integrity of his character.

Each day during all of the period covered by this action the defendant city has been diverting from this watershed 4,100,000 gallons of water, or 6.3 cubic feet per second. Under the grant given to it by Mr. Dolge it had a right, so far as he and his successors in title are concerned, to make this diversion, but upon the conditions and covenants stated in the grant. Under the grant it had the right and had the duty to allocate sites for storage reservoirs; this, in accordance with and within the time specified in the grant, the city did, preparing maps showing the allocation of the proposed reservoirs, together with their capacity, as follows:

| | |
|---|---|
| Klondike | 750,000,000 gallons |
| Crosby Vlaie | 380,000,000 gallons |
| Kettle Brook | 278,000,000 gallons |
| Eaton Pond | 71,000,000 gallons |
| Beaver Brook | 170,000,000 gallons |
| Total | 1,649,000,000 gallons |

This the city planned to fulfill its covenants in the Dolge grant. It failed to carry out its proposal excepting with respect to the Klon-

dike reservoir and to Eaton pond, which, as will appear, are far from adequate to compensate for the diversion.

Having now interpreted the grant and determined from it and the surrounding circumstances what was in the minds of the parties at the time, and what were the storm water flows out of which the city was to provide for the diversion, and what was the normal and natural flow of the stream at the points of diversion, we reach the inquiry as to the extent to which the city has fulfilled its obligations under the Dolge deed. To determine this we must fix the extent of its duty. At first blush, it might be said that it was called upon to maintain a storage adequate to compensate for the total of its annual diversion, 1,496,500,000 gallons. It is quite obvious, however, that no duty would exist during ninety-two days of storm water flows in each year, because the city would not be causing any damage during that time; according to the minds of the parties there was ample of storm water going to waste at that time, and that water the city had the right to take, under the grant; there was no occasion for compensation then. Mr. Dolge of course had it in mind to protect himself against damage by reason of the diversion, and the city had in mind to compensate for damage caused by the diversion; but there could be no damage from the use of water during the storm water period as the parties at the time understood storm water. We, therefore, eliminate from calculations of the extent of the duty of the city the months of March, April and May, the usual definite and reliable period of storm water flows, or ninety-two days in each year, during which there is ample of storm water not only to supply such storage as the city is called upon to provide for but also to compensate for the amount of diversion for which it is chargeable; and all of this without doing any actual damage. This follows from the interpretation of the grant itself, and no " usable " flow for power purposes may alter the normal flow of a stream so as to give any additional right by reason of a change from the normal method of use. So that the city's obligation to provide storage would be limited by the extent of its diversion during the period of 273 days in each year, or, for the purposes of this action, 4,100,000 gallons per day, or practically 1,120,000,000 gallons per annum. (I have not here considered leap years.) This amount it owed the duty to return to the stream out of accumulated storm water; and in reaching a determination of the capacity of reservoirs adequate for such purpose it must take into consideration the natural losses, as by evaporation. It follows, therefore, that if it would comply with the provisions of the Dolge deed it must construct and maintain reservoirs of a size adequate to provide, out of storm waters, for

the compensation of the stream to the extent of the water taken by it from the stream, to wit, 1,120,000,000 gallons per annum, having in mind that it must be prepared also to let flow at all times an amount equal to such normal and natural flow at each reservoir. In view of the fact that in the operation of reservoirs it is impractical if not impossible to distinguish between storm water and natural flow on the catchment areas above the reservoirs impounding such waters, and that such reservoirs necessarily interfere with the natural flow, these reservoirs must be so equipped with outlets that there may be at all times the "normal" run off of the catchment area contributing thereto, and also the amount of water diverted for municipal purposes.

The city has signally failed to carry out its own program (as laid out by its own engineers and as published to the world by the filing of the maps of the proposed reservoirs during or prior to the year 1898 in the office of the clerk of the county of Herkimer) to provide reservoirs with a capacity of 1,649,000,000 gallons. Of its proposed plan it only constructed the dam at Eaton pond, at the same height as the old dam, in or about the year 1898, and the Klondike reservoir in the year 1898; beyond that it has done nothing to carry out the covenants contained in the Dolge deed on its part to be performed.

The average flow at Eaton pond during the storm water months is one-seventh of such flow at Dolgeville, and amounts to 168 cubic feet per second. This is arrived at as follows: Flowage at Dolgeville: March, 951 cubic feet per second; April, 1,883 cubic feet per second; May, 703 cubic feet per second; totals, 3,537 cubic feet per second. Flowage at Eaton pond (one-seventh); March, 136 cubic feet per second; April, 269 cubic feet per second; May, 100 cubic feet per second; totals, 505 cubic feet per second. One-third of which 505 cubic feet per second gives the average as above, 168 cubic feet per second. Deducting from this the normal and natural flow at Eaton pond, as found above, 58 cubic feet per second, leaves available for storage purposes, out of the storm waters for three months, 110 cubic feet per second, which equals 874,400,000 cubic feet of water for those three months, or, without considering the loss by evaporation, over four times the present requirements of the city of Little Falls for municipal water supply. So the city has available ample storm water for storage purposes.

The city has made provision at Eaton pond for 71,000,000 gallons, as has been agreed upon by the parties hereto. It has also constructed the Klondike reservoir, with a capacity, with the water at the crest of the dam, of 750,000,000 gallons. The construction of the Klondike reservoir was an economic mistake. The catch-

ment area of Spruce creek above Eaton pond dam is 36.2 square miles. The catchment area above the Klondike dam is 1.067 square miles, or 2.94 per cent of the catchment area behind Eaton pond dam. The mean flow at Klondike reservoir is 2.34 cubic feet per second. The normal and natural flow, exclusive of storm water (2.94 per cent of that at Eaton pond), is 1.71 cubic feet per second. The storm water flow at Eaton pond dam, over and above the normal flow, is 110 cubic feet per second for ninety-two days in the year. On the same basis, the storm water flow at Klondike reservoir dam would be, for such period, 3.234 cubic feet per second. This, for the period of ninety-two days, would equal 192,750,000 gallons. The capacity of the reservoir has been stated at 750,000,000 gallons. It is obvious, therefore, that out of storm waters it would take some four years to fill this reservoir, for of course there is no right to hold back in the reservoir the normal and natural flow, exclusive of storm water of 1.71 cubic feet per second.

The surface area of the reservoir, when filled, is 136.68 acres, or, in round numbers, 6,000,000 square feet. The elevation of the territory is approximately 1,360 feet. While the evidence on the subject of evaporation is far from being clear and satisfactory, I am satisfied, from the evidence as I construe it, and under all the circumstances of the situation, that the annual evaporation in the region under consideration would be at least twelve inches, or, in the case of the Klondike reservoir, 6,000,000 cubic feet. While I know that this is much less than the amount of normal evaporation in lower altitudes, I am satisfied and, therefore, find that the evaporation to be accounted for at Klondike is 6,000,000 cubic feet or approximately 43,000,000 gallons per annum.

We are now in position to tabulate the obligation of the city and the extent to which it has fulfilled such obligation:

The city is charged with (gallons) . . . . . . . . . . . . . . 1,120,000,000
The city is credited with compensation as follows:
  Eaton pond, as agreed (gallons) . . .   71,000,000
  Klondike reservoir, the total of the
    storm water flow of 192,750,000
    gallons, less annual evaporation
    of 45,000,000 gallons . . . . . . . . . . . 147,750,000

    Total compensation (gallons) . . . . . . . . . . .  218,750,000

    Leaving yet to be compensated for (gallons) . . .  901,250,000

Any reservoir adequate to make this compensation would have to have a capacity equal to this amount, plus the amount of annual

evaporation. It seems to be agreed that the proper site for an adequate reservoir would be at the Eaton pond dam. This reservoir of course would absorb the present amount of storage there of 71,000,000 gallons. While this is essentially an engineering problem, it would seem that, with the proper use of the Klondike reservoir, the raising of the dam at Eaton pond to the level of 1368, or 9.2 feet above the present level, giving a storage capacity of 1,420,000,000 gallons, would be adequate. The area of a reservoir of such capacity would be 36,000,000 square feet; and the evaporation would be approximately, on the theory upon which we have calculated evaporation, 269,280,000 gallons. This would leave a net of stored water of 1,150,720,000 gallons, which would be adequate, with the continued use of the Klondike reservoir, to meet the present-day requirements of the city of Little Falls, with a slight surplus of about 178,000,000 gallons. The raising of the present dam nine and one-half feet would, with the continued use of the Klondike reservoir, cover not only the present requirements but leave a reasonable factor of safety for future increase of diversion. In expressing this view I have not taken into consideration the possibility of filling the reservoir more than once a year. If it could be filled oftener the dam could be correspondingly lower.

The Klondike reservoir is located some five and one-half miles by direct line and eight miles by road above Eaton pond dam, is of little avail, requires cleaning out on account of stagnant water, and ought not to be used for over one-fourth of its capacity; that is, to the extent that the storm waters in any one year would fill it. As affecting the question of damages, there is little evidence in the case from which one can determine to what extent it has been used for compensating purposes. I have, however, allowed it to be used for purposes of compensation because it has been there and available and because it has been used to some extent at least. From it in any event the normal flow of 1.71 cubic feet per second must be permitted to flow. Only thus can the water be kept fresh and potable. The practice has been to close up the outlets of the Klondike reservoir entirely, so as to use the normal as well as the storm water flow to fill it. This is an unwarranted procedure, whether considered from the standpoint of riparian rights or from the standpoint of public health.

Having laid the basis for injunctive relief, we now reach the question of the damages which the plaintiffs have sustained by reason of the diversion which has taken place for the period as agreed, commencing February 1, 1917 (the date agreed upon), down to the date of the decree to be entered in accordance herewith.

The defendants Julius Breckwoldt & Company and the Utica

Gas and Electric Company, impleaded in the case, are in the same position, so far as the right to damages is concerned, as are the plaintiffs; they have failed to appear in the action and to make any claim for damages. There has been offered on the part of the plaintiff Daniel Green Felt Shoe Company no evidence upon which to base a finding in respect of the damages suffered by it. The head under which it is using the water of East Canada creek is slight; the amount of its damages, if any, on account of the low head, would be small. In any event, there is no basis upon which its damages, if any, can be computed.

The subject of damages, therefore, will be considered only in reference to those suffered by the plaintiff The Adirondack Power and Light Corporation at its two plants, one known as the Ingham's Mills plant and the other as the Beardslee Falls plant.

As to the Ingham's Mills plant, the head under which the water could be used during the period covered was 122 feet without and 125 feet with flashboards. At the Beardslee Falls plant the head at the time of the commencement of the action was 115 feet without and 118 feet with flashboards; since August 15, 1924, the head has been 154 feet without and 157 feet with flashboards.

In calculating the damages, the heads at the crests of the dams, or without flashboards, will be used, for the reason, as agreed to by the plaintiff The Adirondack Power and Light Corporation, that the head as actually used was at times with flashboards and at other times the water would be drawn down three feet below the crest of the dam. So that, on the whole, the average head at which the water has been used is that shown by the level of the crests of the dams.

So far as said plaintiff's Ingham's Mills plant is concerned, the damages should be calculated on the basis of the diversion of 6.3 cubic feet per second, less the amount of compensation by storage, as hereinafter noted.

As to the Beardslee Falls plant the situation is somewhat different. In 1903, as to this plant, a decree of the Supreme Court was entered which definitely settled the rights of the Beardslee Falls plant and provided a method of compensation; the city was directed to maintain a flow of three and one-half inches in height over an eighteen-foot weir to be erected below the Eaton pond dam. This the defendant city has done. It is the contention of the plaintiff The Adirondack Power and Light Corporation that the city has forfeited its rights under this decree by reason of a claimed violation of its terms. I do not so read the decree. The decree provides that the city shall have the right to make application at the foot of it, in case it should desire to increase the amount of

its usage of water, for a modification thereof. It has made no such application; neither has the said plaintiff made any application at the foot of said decree. The defendant city did, however, without application to the court, materially change its hydraulic structures as they existed at the time of the decree and did increase the capacity of its diversion pipe and the diversion from 3,000,000 gallons per day at the time of the decree to 4,100,000 gallons per day. This was done in 1908. It has, therefore, increased its usage here 1,100,000 gallons per day, for which no compensatory provision has been made, and to the damage, to that extent, of said plaintiff. Inadequate though the provisions of the Beardslee decree now seem to be, no appeal was taken from it, and the said plaintiff is, therefore, bound by it, and the limit of the basis of its damage is the increase in the amount of the diversion. While in relationship to this plant there is no obligation whatsoever to the said plaintiff growing out of the provisions of the Dolge grant in reference to storage, yet, in actual practice, said plaintiff would suffer no damage during the period of storm waters by reason of the diversion, and, therefore, the period upon which damages are to be computed is limited to the periods of normal flow, or 273 days in the year.

There has been agreement upon certain factors to be taken into consideration in determining the amount of damages sustained by the plaintiff The Adirondack Power and Light Corporation. It has been agreed that for the six-year period ending January 31, 1923, the value to be used is $.01 per kilowatt hour. This rate seems at the present time to the court to be excessive. The evidence as submitted, however, shows that, in order to supplement the power lost by the said plaintiff during this period, said plaintiff actually paid, for purchases of such power, at the rate of $.0144 per kilowatt hour; and it, therefore, appears that for this period, for the character of the power that the plaintiff had to purchase, a value of $.01 per kilowatt hour is not unreasonable. It has also been agreed that for the balance of the period the rate to be used in determining the damages is $0.005 per kilowatt hour; that the load factor to be used is 50 per cent, and that the efficiency at the switchboard is 78.5 per cent. The total diversion by the city is 6.3 cubic feet per second. It has compensated for this diversion to the extent of 218,750,000 gallons, or, for the 273 days of the year which have been taken as the period of flow unaffected by storm waters, at the rate of 801,282 gallons per day. As its daily consumption is 4,100,000 gallons, it has, therefore, made compensation for 19.54 per cent of its diversion; 19.54 per cent of 6.3 cubic feet per second is 1.231 cubic feet per second, so that the

amount of diversion for which the city has not yet made compensation is the difference between 6.3 cubic feet per second and 1.231 cubic feet per second, or 5.069 cubic feet per second.

There is no basis for making such a reduction at the Beardslee Falls plant of said plaintiff, for the reason that the rights of the plaintiff in respect of its Beardslee Falls plant are affected and governed by the so-called Beardslee decree, and it was assumed as a basis of the decree that upon a compliance with its terms by the city there would be full compensation to the extent of the city's then consumption of 3,900,000 gallons per day; and the damages in respect of the Beardslee Falls plant are, therefore, calculated on the basis of the loss of 200,000 gallons per day for the period of 273 days. Two hundred thousand gallons is equal to .309 cubic feet per second. The formula for determining theoretical horse power which has been used is as follows: Head x 62.5 (weight of a cubic foot of water) x flow in cubic feet per second, divided by 550 (foot pounds per second).

Having now all the factors determined, we may proceed to calculate the damages which have been sustained by the plaintiff The Adirondack Power and Light Corporation, first at its Ingham's Mills plant and second at its Beardslee Falls plant.

### DAMAGES SUSTAINED AT THE INGHAM'S MILLS PLANT.

#### TABULATION OF FACTORS.

Head, 122 feet.

Rate of diversion, 5.069 cubic feet per second.

Diversion days each year, 273.

Efficiency at generator, 78.5 per cent.

Load factor, 50 per cent.

Value of power from February 1, 1917, to January 31, 1923, $.01 per kilowatt hour.

Such value from February 1, 1923, on, $.005 per kilowatt hour.

Theoretical horse power developed at Ingham's Mills upon the flow used (5.069 cubic feet per second), 70.274 horse power.

Actual horse power developed (78.5 per cent efficiency), 55.165 horse power.

Equals 41,153 kilowatts.

Fifty per cent load factor, 20,577 kilowatts.

Kilowatt hours per day, 493.848 kilowatt hours.

For 273 days, 134,821 kilowatt hours.

Value, at $.01 per kilowatt hour, per annum, $1,348.21.

Value for the six-year period, $8,089.26.

Value for each year after January 31, 1923, at the rate of $.005 per kilowatt hour, $674.11.

## At Beardslee Falls Plant.

The factors vary from those used in the Ingham's Falls plant as follows:

Head to August 15, 1924, 115 feet.

Head from August 15, 1924, to date, 154 feet.

Diversion per day, 200,000 gallons, or .309 cubic feet per second.

### COMPUTATION.

Horse power developed by 1.702 cubic feet per second under 115 feet head, 100 per cent efficiency, 4.038 horse power.

Seventy-eight and five-tenths per cent efficiency, 3.169 horse power.

Equals in kilowatts, 2.365 kilowatts.

Fifty per cent load factor, 1.183 kilowatts.

Kilowatt hours per day, 28.392 kilowatt hours.

For 273 days in each year, 7,751 kilowatt hours.

Value, at $.01 per kilowatt hour, per annum, $77.51.

Value, for six years to February 1, 1923, $465.06.

As to subsequent years, from February 1, 1923, to August 15, 1924 (the head being 115 feet):

One year, to February 1, 1924, at $.005 per kilowatt hour, $38.76.

From February 1, 1924, to August 15, 1924, 196 days, less 92 days of the storm water period, or 104 days, at $.005 per kilowatt hour, $14.76.

For period from August 15, 1924, on, under a head of 154 feet, computed as follows:

Theoretical horse power, 5.408 horse power.

Seventy-eight and five-tenths per cent efficiency at generator, 4.245 horse power.

Equals, 3.167 kilowatts.

Fifty per cent load factor equals, 1.584 kilowatts.

Kilowatt hours per day, 38.016 kilowatt hours.

Two hundred and seventy-three days, 10,378 kilowatt hours.

Value per annum, at $.005 per kilowatt hour, $51.89.

### SUMMARY.

| | | |
|---|---:|---:|
| Damages at Ingham's Mills for the six-year period ending January 31, 1923 | $8,089 | 26 |
| Damages at Beardslee Falls for said six-year period | 465 | 06 |
| Total damages for the six-year period | $8,554 | 32 |
| Damages per annum after the six-year period: | | |
| At Ingham's Mills | $671 | 11 |
| Damages at Beardslee Falls up to August 15, 1924 | 53 | 52 |
| and thereafter at the rate of $51.89 per annum. | | |

No interest has been allowed excepting from the date of the entry of the decree.

While the principles of law involved herein are comparatively simple and the underlying facts as found are likewise simple, in order to reach a conclusion it has required a mass of evidence, of exhibits, of calculations and of expert testimony in reference to stream flows, drainage areas, stream regulation, etc., which has been quite extraordinary. The court has been aided by the testimony of very able experts on both sides, which has been presented with candor and a purpose to aid the court. The court has had the assistance of able counsel on both sides, who have shown equal disposition to aid in the solution of a very complex problem. The effort of the court has been, out of the mass of testimony and evidence presented, to reach a solution of the problem which, while according with sound principles of the law of waters, would be practical as a solution of the problems involved, not only for the present but for the future. As is necessary in cases of this character, where it is impossible to reach absolute certainty, reliance has been had, of necessity, upon the law of averages, both in respect of the determination of the fundamental obligations yet unfulfilled of the defendant city and in respect of damages; but it is my belief that the final result is such that it is as close an approximation to absolute right as is practically possible. While there is no material disagreement upon the data from which has been determined the liability of the city to compensate by storage reservoirs, there is a wide divergence between the findings of the court as to the amount of damages and the claims of the plaintiff The Adirondack Power and Light Corporation. This difference arises by reason of the fact that the damages shown in plaintiff's evidence were based upon a diversion of 6.5 cubic feet per second, when as a matter of fact the uncompensated diversion, so far as the Ingham's Mills plant was concerned, was 5.069 cubic feet per second, and by reason of the fact that the rate at which the compensation should be made per kilowatt hour has been materially reduced.

The work of the court has been simplified by stipulated facts, many of which were agreed to as a result of most exhaustive research on the part of the able engineers and counsel on both sides.

While of course the city of Little Falls has the paramount right to acquire and have for the use of its inhabitants an adequate water supply, and has for such purposes the right of condemnation, and the decree to be entered herein must recognize this right, yet, not having seen fit to proceed by condemnation but to follow what seemed to it to be the line of least resistance, it becomes liable in damages, as hereinbefore found, and subject to injunctive relief in

behalf of the plaintiffs. The acts of the defendant city in diverting the waters of East Canada creek from the plaintiffs without adequate compensation constitute a continuing trespass upon the water rights of the plaintiffs, for which of course there is no adequate remedy at law. Furthermore, such continuing trespass would necessarily lead to multiplicity of actions, which to some extent, so far as the plaintiff The Adirondack Power and Light Corporation is concerned, are, if the conclusions of the court become effective, somewhat simplified.

The plaintiffs, however, are entitled to injunctive relief, the exact phraseology of which will be determined in the final decision, but, generally, as follows:

(1) Restraining the defendant city of Little Falls from diverting from the Beardslee Falls plant of the plaintiff The Adirondack Power and Light Corporation a volume of water in excess of 3,000,000 gallons per day, unless and until it shall either have condemned the right to make such diversion or shall have by adequate water storage provision compensated therefor.

(2) As to the Ingham's Mills plant, the plaintiffs are entitled to an injunction, mandatory in character, commanding the defendant city of Little Falls to comply, by the construction of adequate reservoir or reservoirs for the storage of storm water, with its obligation under the covenants made by it in the Dolge deed, as herein found; or, in the alternative, and in the event of its failure so to do, to be enjoined and restrained from the diversion of the waters of Spruce creek and its tributaries.

(3) The injunctive relief shall not be effective until a reasonable time after the entry of the decree herein in which the city may erect such adequate storage reservoir or reservoirs; and such reasonable time seems to the court to be the period of two years, barring unforeseen circumstances. The delay in making operative this injunction, however, shall in no wise affect the liability in damages of the defendant city for its continued and uncompensated-for diversion during such period.

The obligations of the defendant city under the provisions of the Dolge deed are contractual in nature, but have no application to the Beardslee Falls plant of the plaintiff The Adirondack Power and Light Corporation, for the reason that this property was in no wise affected by the provisions of the Dolge deed, and for the further reason that the rights with respect thereto have been settled by the so-called Beardslee decree. However, in the opinion of the court, upon compliance by the defendant city of Little Falls with the provisions of the Dolge deed in reference to the impounding of storm waters and the use thereof to compensate for the diversion of water by said city for its municipal water supply, there will be no basis

for any claim of damages or for injunctive relief on the part of the plaintiff The Adirondack Power and Light Corporation in respect of its Beardslee Falls plant.

At its Ingham's Mills plant the said plaintiff has of course its fundamental rights as a riparian owner; but in so far as the water rights owned by Alfred Dolge at the time of the deed to the city of Little Falls were acquired by said plaintiff (although combined with water rights acquired from others to make up its Ingham's Mills power), it is bound by the provisions of the Dolge deed. True, water rights acquired from others than Mr. Dolge, which it combined with those acquired from said Dolge to make up the water power of said plant, are technically unaffected by the provisions of the Dolge deed. It will be recalled that Mr. Dolge was a riparian owner on only one bank of the stream below High Falls and above Ingham's Mills, and that the said plaintiff is now owner of both banks. Rights to the use of the water for power purposes are to use it *per tout et per my*, and there can be no practical differentiation between these rights purchased through Dolge and those purchased from others, which, together, make up the Ingham's Mills plant power. Furthermore, when the defendant city shall have fulfilled its covenants under the Dolge deed said plaintiff will suffer no damage at this plant and will be denied injunctive relief as to those of its water rights used in making this plant which are unaffected by the provisions of the Dolge deed.

The plaintiffs will prepare findings of fact and conclusions of law in accordance herewith, to be settled if not agreed to upon ten days' notice.

Judgment ordered accordingly.