J. A. JACOBSON, INC., Claimant, *v.* THE STATE OF NEW YORK, Defendant.   Claim No. 19001.

Court of Claims, May 27, 1931.

*Frank H. Mott,* for the claimant.

*John J. Bennett, Jr., Attorney-General [John J. Campbell, Deputy Assistant Attorney-General,* of counsel], for the State of New York.

ACKERSON, J. The claimant herein is a domestic corporation of the State of New York. It conducts a store on South Main street in the city of Jamestown, N. Y., in which it carries on the business of dealing in cigars, tobacco, candy and other merchandise. This store is adjacent to the Chadakoin river which flows through the central part of said city of Jamestown and which is the outlet of Chautauqua lake, a body of water about eighteen miles long and which is on the average about one mile wide.

It appears from the evidence in the case that on November 30, 1927, and also on December fourteenth of the same year the Chadakoin river overflowed its banks in the vicinity of claimant's store; that the water therefrom ran into the basement of the store and injured and destroyed a large amount of merchandise whereby the claimant suffered damages to the extent of at least $7,000.

The State does not dispute the fact that claimant was damaged in that amount and that the water which did the damage came from the Chadakoin river over its banks into the basement of claimant's store, but it very strenuously contends that the State of New York was in no way responsible therefor.

The claimant contends that the Chadakoin river is a navigable stream and calls the court's attention to chapter 78 of the Laws of 1807 and chapter 67 of the Laws of 1829, which declare it to be a public highway. It also offered proof to show that portions of it, at least, had been actually navigable by steamboats for many years. For a long time, however, it has been impossible to navigate this stream for more than a short distance from Chautauqua lake. In the city of Jamestown bridges and buildings have been constructed over and above the bed of the stream and more than sixty-five years ago a dam was constructed directly across the stream a short distance above the premises now occupied by this claimant. This dam was known as the Warner dam and the water impounded by it was used for developing power by certain

individuals, firms, corporations or associations referred to on the trial of this claim as the Power Owners' or Dam Owners' Association.

This was the situation of affairs when the Legislature of the State of New York decided to intervene and expressed its determination so to do by chapter 758 of the Laws of 1913, which became a law May 27, 1913, and which reads as follows:

"Section 1. The superintendent of public works is hereby authorized to cause Chadakoin river, known also as Chautauqua lake outlet, to be dredged or otherwise improved between such points at or near the city of Jamestown as the superintendent may determine in such manner as will relieve the high water conditions at and near such city, subject to the approval of the canal board. Such work shall be accomplished pursuant to plans and specifications to be furnished by the state engineer and surveyor; provided, however, that if such work may injuriously affect the water power or mill right of any person, firm, association or corporation, the superintendent of public works shall not proceed with such work or expend moneys hereinafter appropriated therefor until releases of such damage to the state, duly executed and approved by the attorney-general, have been filed with the superintendent.

" § 2. The sum of one hundred thousand dollars ($100,000), or so much thereof at may be necessary, is hereby appropriated out of any moneys in the state treasury not otherwise appropriated, for the purposes of the work and improvement provided for in section one of this act, to be paid out by the state treasurer on the warrant of the comptroller to the order of the superintendent of public works.

" § 3. This act shall take effect immediately."

It will be noted, therefore, that the main purpose of this legislation was to " relieve the high water conditions at and near such city " of Jamestown, the statement of the learned Attorney-General on his brief herein to the contrary notwithstanding.

Following the passage of this act other acts of a similar nature were passed in several succeeding years reappropriating money for the same purpose. Finally in or about 1916 the State of New York by and through its Department of Public Works tore out and removed the old Warner dam across the Chadakoin river and constructed in its place a new concrete dam containing four taintor gates. This new dam, so constructed by the State at its own expense, prevented any water whatever from flowing in the bed of the Chadakoin river below it except such as passed through its taintor gates. This dam at its base near the bed of the stream has an elevation of about 1,300 feet above sea level. Its crest

has an elevation of about 1,311 feet above sea level. Above this dam was a pond of several acres in extent and above that another part of the channel of the Chadakoin river through which the water from Chautauqua lake flowed down into the mill pond. This mill pond above the dam had two outlets. One through the taintor gates in the dam into the stream channel below the dam and another outlet through a raceway connecting the mill pond with the channel below the dam.

Before the State constructed this new dam it exacted of those who purported to own the power rights connected with the old Warner dam an agreement which is known as Exhibit 10 in this case and in which the power owners were the parties of the first part and the State of New York was the party of the second part. The important parts of that agreement so far as this controversy is concerned, are paragraphs 1 and 4 which read as follows:

1. " The parties aforesaid mutually agree that the maximum height at which water may be impounded in or by said dam when constructed, shall be one thousand three hundred and ten (1,310) feet and the minimum height one thousand three hundred and eight (1,308) feet above sea level as fixed by the United States Geological Survey, two hundred and fifty (250) feet above the said dam."

4. " The parties of the first part agree that they will at their own expense keep up and maintain and keep in repair the new dam, and do hereby relieve, release and discharge the State of New York from all expense and liability on account of such maintenance and repair and they further agree that in the operation of said dam and the use of water therefrom they will not raise the water above said maximum head of one thousand three hundred and ten (1,310) feet above sea level or draw water down below said minimum head of one thousand three hundred and eight (1,308) feet above sea level at the point of said gauge."

The State then went on and completed the dam and left it to be maintained and operated by the power owners in accordance with the terms of the foregoing agreement.

Such was the situation on the 30th day of November and the 14th day of December, 1927, when the basement of the store in question was flooded by water from the Chadakoin river and the damages inflicted for which the claimant contends it should be recompensed by the State.

The claimant, in seeking redress for the injury inflicted upon it, first went to the Legislature and made its complaint, which was followed by the passage of an enabling act known as chapter 487 of the Laws of 1929, which authorized and empowered this court to hear, audit and determine this claim and by which the

State consented to have its liability on the claim herein determined. It further provided that if the court found that the claimant sustained damages as aforesaid, and that if it appeared that such injuries were caused by the negligent acts of the State, this court might make such an award herein in favor of the claimant as should be just and equitable.

It is practically conceded by the State that the damages alleged in the claim were inflicted upon the claimant by the overflow of the Chadakoin river as the claimant has abundantly established by its proof. There is some little dispute as to the amount of those damages but no dispute as to the nature of the injury and that it was caused by the overflow of the Chadakoin river.

Practically the only serious question in the case, therefore, is whether or not this flood on the two dates in question was caused by the negligence of the State.

The State constructed this dam across the channel of the Chadakoin river in such a manner as to prevent the flow of any water whatever in the channel of said river adjacent to claimant's store unless some person or persons opened the taintor gates in the dam. When the taintor gates were closed the water was impounded above the dam and its only outlet was through the raceway from which it could be drawn by the power owners for power.

After constructing the dam the only provision made by the State to prevent its becoming a menace to the community both above and below the dam was the agreement it entered into with the power owners on the 1st day of November, 1915, known as Exhibit 10 herein. This agreement in no way waives the jurisdiction and authority of the State over this dam nor does it transfer to any person or persons any interest in the dam. It stood then and has ever since stood as a State structure and over and to which the State has ever had undoubted right and authority.

So far as this claimant and the public generally are concerned the important clauses in that agreement are two paragraphs quoted above. In paragraph 1 the State imposed on the power owners the duty of impounding the water in or by that dam at a height of not less than 1,308 nor greater than 1,310 feet above sea level. The State thereby arbitrarily established the depth of water behind that dam at eight feet or more regardless of whether there were flood conditions to be taken into account or not; regardless of whether or not in seasons of unusual rainfall it might be necessary to open those taintor gates and draw down the water back of that dam to a lower elevation than 1,308 feet in order to take care of an impending flood without being compelled to cast greater amounts of the impounded water into the channel below the dam than it could carry.

In paragraph 4 the State imposed upon the power owners the duty of maintaining the dam and keeping it in repair and also of indemnifying the State " from all expense and liability on account of such maintenance."

The claimant contends that this is a recognition by the State of the fact that it is liable to those who suffer damages by reason of this dam either from the construction or negligent operation. We cannot see any escape from this view of the situation.

The State is not immune from damages in a situation like this any more than an individual would be under like circumstances. It cannot build a dam across a natural watercourse and flood out property owners above by raising the water over their land nor flood those below by suddenly discharging from the dam greater amounts of the impounded water than the stream channel can carry, without becoming liable to those injured.

The fact that it has entered into an agreement with the beneficiaries of its benevolence who are using the dam for their own profit to the effect that they shall maintain and operate it in no way relieves the State from liability for damages caused by the improper operation of its own dam. So far as the injured third party is concerned, those to whom the State has given the power to inflict the injury are the agents of the State and the State cannot escape liability in these circumstances for the negligent and unlawful operation of its own dam by those to whom it has given the authority.

The State, however, stoutly contends that there was not any negligence or impropriety displayed in the operation of the dam at the time in question. We are not in accord with that view of this case. The facts do not warrant it.

This claimant had occupied these premises for eighteen years. It had never been flooded before nor since the two occasions complained of in 1927. The first occasion was November thirtieth and the second was December fourteenth. The month of November was a month of unusually heavy rainfall; about three times the normal amount of rainfall. This should have been a warning to those in charge of the taintor gates in this dam to gradually draw down the water behind the dam. But it was not done. For practically the whole month of November the stream bed below the dam had been nearly dry. The situation that existed here made those who controlled the dam reluctant to lower the head of water behind the dam. The higher the head, of course the more power did the power owners derive from the dam. They had delegated the operation of the taintor gates to Shearman Brothers Company, one of the parties to the agreement with the State and

one of the users of water from the dam for power. This company put the gates in charge of a fireman in its boiler room and a night watchman. Mr. Shearman testified that both he and his son gave these men directions from time to time. Neither the fireman nor night watchman was called upon the trial and the Attorney-General stated that while they were both available he did not desire to call them as they did not know much about it and it does not appear that the claimant knew who they were nor where they could be found. However, it does appear by the evidence that these taintor gates were kept so nearly closed practically all the time through this very rainy month of November that there was very little water in the stream channel below the dam. And this situation was continued until the water impounded by this dam was flooding those above the dam and was threatening to go over the banks of the raceway and was several inches above the elevation of 1,310 feet above sea level.

These acts of the power owners in impounding this water to such a height when they must have known from the continual rainfall that a flood was impending were not only wrongful and negligent but it was contrary to the agreement they had made with the State in which they had agreed that they would not impound water there to a greater height than 1,310 feet above sea level.

The evidence discloses that the capacity of the stream channel from Chautauqua lake into the mill pond immediately above the dam was only 3,000 cubic feet per second while the capacity of the channel below the dam was 3,400 cubic feet per second. And in addition to the channel immediately below the dam the mill pond had the further outlet through the raceway so that if any care at all had been used in keeping down the water in the mill pond when a flood was in prospect it never would have been necessary to overflow the banks below the dam in any emergency because the water could not get into the mill pond as fast as it could get out when any reasonable use of the stream channel below the dam was made. Furthermore, the evidence discloses the fact that it has been determined by a computation made from the rainfall in the vicinity of Chautauqua lake that if there had not been any dam across the Chadakoin river the run off at this time would not have exceeded 1,100 to 1,200 cubic feet per second.

The Attorney-General contends that if the natural channel of the Chadakoin river below claimant's premises had not been greatly contracted by structures that had been built along its banks and in the middle of the stream there would not have been any overflow into claimant's premises. That was no con-

cern of this claimant nor does it excuse, in any way, the action of the persons manipulating the taintor gates in permitting more of the impounded water to pass through the dam than could be carried by the channel below as it then existed no matter what its contractions might have been. (*Noonan* v. *City of Albany*, 79 N. Y. 470.)

The releasing of the impounded water from this dam in sufficient quantities to overflow the banks of the stream below the dam under the circumstances as described by the testimony in this case on the two days when claimant's basement was flooded by it was an unlawful and negligent act as has been repeatedly held from time to time by the courts of this State in similar situations. (*Sipple* v. *State*, 99 N. Y. 284; *McKee* v. *Del. & Hudson Canal Co.*, 125 id. 353; *Brewster* v. *Rogers*, 169 id. 73; *Fulton Co. Gas & E. Co.* v. *Rockwood Mfg. Co.*, 205 App. Div. 787; *Butterfield* v. *State*, 103 Misc. 199, and cases cited.)

We accordingly reach the conclusions designated in the enabling act as prerequisite to an award herein that the injuries have been sustained as described in the act and that such injuries and the consequent damage were caused by the negligent acts of the State of New York both of commission and omission.

We do, therefore, make an award herein in favor of the claimant and against the State in the sum of $7,000, which we believe to be just and equitable compensation for the damages suffered by the claimant as a result of the negligent and unlawful acts of the State of New York as above set forth.

BARRETT, J., concurs.