PATSY DESTITO et al., Doing Business as SAVOY RESTAURANT, Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28030.)

Court of Claims, March 3, 1955.

*John P. Gualtieri, Albert Averbach, G. Edward La Gatta* and *Dominick J. Parry* for claimants.

*Nathaniel L. Goldstein, Attorney-General (James G. Austin* and *Douglas S. Manley* of counsel), for defendant.

LOUNSBERRY, P. J. This claim is for damages to the claimants' premises, situate on Dominick Street in the city of Rome, adjacent to the Mohawk River, resulting from an overflow of that river which occurred October 2, 1945. The claimants contend that the flood resulted from negligence and mismanagement in the operation by the State of Delta Dam, which dams the Mohawk about five miles above Rome and forms a substantial reservoir known as Lake Delta.

This is the second appearance of this problem before this court. *Iodice* v. *State of New York* (Claim No. 28103), decided by this court June 10, 1949, arose from the same fact situation and involved other premises in the same vicinity. We concluded that improper and negligent operation of the dam during the year 1945 caused, or at least aggravated, the flood condition in

the city of Rome, and granted judgment in favor of the claimant. The Appellate Division disagreed, however, and dismissed the claim (277 App. Div. 647), on the grounds that the dam was erected to supply water for the Barge Canal and that the State was under no duty, either by statute or by common law, to operate it for flood control purposes; that it violated no right of the claimant so long as it discharged no greater volume of flood waters from the dam than flowed into the reservoir; and, that during the flood in question it in fact discharged from the dam a lesser volume of water than meanwhile entered the reservoir. The Court of Appeals affirmed the decision of the Appellate Division without opinion (303 N. Y. 740).

The decision of the Appellate Division in the *Iodice* case (*supra*), must therefore necessarily govern the disposition of the present claim unless the claimants establish either (a) that the very existence of the artificial structure known as Delta Dam and of the artificial lake formed by it in some manner caused the flood on the claimants' premises to be worse than it would have been had the dam not existed; or (b) that the State in fact discharged more water from the dam than flowed into the reservoir during the flood period; or (c) that the dam was in fact erected in part for flood control purposes and was improperly regulated for such purposes; or (d) that, whatever the original purpose of the dam, the State had in fact assumed a duty to operate the dam with regard to flood prevention and had improperly discharged such duty.

The record is extremely voluminous, comprising 2,362 pages and some 140 exhibits, to which must be added 889 pages of testimony and some 80 exhibits in the *Iodice* case which were incorporated by reference into the present record. It is obviously impossible to detail this mass of material, but the court deems the following essential facts adequately established.

By chapter 147 of the Laws of 1903, known as the Barge Canal Act, the reconstruction of the existing canal system into what is now known as the Barge Canal system was authorized, subject to approval by the voters of a $101,000,000 bond issue for the purpose, which approval was given at the ensuing general election. The act provided, among other things: " The additional water supply required for the improved Erie Canal shall be provided by * * * and building storage reservoirs on the upper Mohawk near Delta and on West Canada Creek near Hinckley, with all necessary feeders for connecting these and existing reservoirs with the improved canal. The supply of water for the Erie Canal shall be sufficient for the uses of the

canal with at least ten million tons of freight carried on it per year.''

Pursuant to this authority the State began in 1908, and completed about 1911, the erection of a large dam across the Mohawk just below the former village of Delta and about five miles upstream from Rome. The completed structure was about 1,300 feet in overall length and about 100 feet high. At a level about eight feet below the top of the rest of the dam was a spillway 300 feet long, the elevation of which was 550.2. The resulting reservoir had an area of about 4½ square miles, and a capacity, when filled to spillway level, of approximately 2,750,000,000 cubic feet of water. At the base were located four discharge pipes, controlled by valves, having a total discharge capacity of about 3,000 cubic feet per second when the reservoir was full, and somewhat less when the water elevation was lower. The construction involved the razing of 295 structures comprising the entire village of Delta, the removal of all trees located in the reservoir area, and the relocation of roads and of a portion of the Black River Canal. The area which drained into the reservoir comprised about 150 square miles. Provision was made for securing additional water by diversion from the Black River by way of an artificial channel known as the Forestport Feeder, which empties into the Mohawk above the Delta Dam.

The waters discharged from the dam flow south along the Mohawk River channel, which was left in its original condition, and into the summit level of the Barge Canal at Rome. The summit level is about 18 miles in length, extending from Lock 21 about a mile west of New London, easterly through Rome to a point about five miles west of Utica. Its chief source of water supply is Lake Delta, but provision exists for securing additional water from Hinckley Reservoir by means of a channel known as the Nine-Mile Feeder, which discharges into the summit level east of Rome. Hinckley Reservoir, also constructed pursuant to the Barge Canal Act, was formed by draining the West Canada Creek, the waters of which normally reach the canal east of the summit level. Excess water is discharged back into the Mohawk River by means of four spillways, located east of Rome, the principal one of which is the Nine-Mile Creek spillway. Standard practice is to maintain the water in the summit level at elevation 420. Above elevation 422.5 navigation ceases because of loss of necessary clearances.

Until the year 1945, it had been the practice of the State to maintain the water level in Delta Reservoir several feet below

the spillway height from late spring through the rest of the navigation season, which lasts until about December 1st. Thus, in the period 1930 through 1944, the average distances between the water level and the top of the spillway were: May 20th, 2.02 feet; June 30th, 4.114 feet; July 30th, 6.354 feet; August 30th, 8.767 feet; September 30th, 9.76 feet; October 30th, 9.527 feet; November 30th, 7.814 feet.

In 1945, the practice was entirely different. The water level remained continuously above the spillway until August 14th. Thereafter it gradually lowered to about two feet below on September 11th. It again rose above the spillway, remained mostly above for several days, and then fell to a point 2.4 feet below on September 25th. It again rose, and on October 1st stood at elevation 550.4, or 0.2 above spillway. On October 1st, 0.37 inches of rain fell, followed by 3.81 inches on October 2d, a two-day total of 4.18 inches. The reservoir level raised to 554.3, or 4.1 feet above spillway. The Mohawk overflowed its banks at Rome, flooding claimants' and other premises. Lifelong residents and official records agree that there had never before been a flood in this section of Rome, aside from some temporary flooding resulting from ice jams, the cause of which had been eliminated many years ago. The canal reached elevation 424.3 and all navigation ceased.

1945 was a year of heavy rainfall. Precipitation at Delta station for the full year was 60.68 inches, 7.14 inches above the previous high in 1925, and 16.81 inches above the average for the period 1919 through 1945. Such a rainfall was by no means unprecedented in the general area, however. Higher annual totals, ranging up to 72.85 inches, had been recorded in five different years at eleven different stations within 60 miles of the Delta station. The 1901 report of the State Engineer and Surveyor (the so-called Bond Report) predicted annual rainfall of 55 inches at Delta. Neither was the October 2d rainfall of 3.81 inches, or the total of 4.18 inches for October 1st and 2d unprecedented. Delta had received rainfalls of 4.93 inches September 29 and 30, 1924, 3.45 inches on October 6, 1932, 5.25 inches July 8 and 9, 1935, and 3.67 inches on July 9, 1940. Very unusual, however, was the occurrence of 10.67 inches between September 9th and September 30th, followed by 4.18 inches the next two days, making a total of 14.85 inches in 23 days. Expert witnesses speculated that the probability of recurrence of such a phenomenon is once in 500 years. The 4.18 inches thus fell on ground already saturated, with a resulting and exceptional runoff factor which the State's experts computed at about 80%.

The various engineers who testified estimated the inflow into the reservoir from such runoff at between 13,650 and 15,500 cubic feet per second. At the peak elevation of 554.3, the reservoir contained some 500,000,000 cubic feet above the spillway eleva**tion.** The peak rate of discharge of this water, as measured October 2d at the Fish Hatchery gauge, below the dam, was 8,560 cubic feet per second, and the average, for the day was 7,270 cubic feet per second. Thus the rate of outflow was from 5,000 to 8,000 cubic feet per second less than the rate of inflow.

This appears to dispose of one issue. It must be concluded that the dam, even though the reservoir was already full, did retard the discharge, and thus lessened the elevation which the water would otherwise have reached at claimants' premises. It also establishes, of course, that the existence of the dam, or the waters impounded behind it, did not of itself cause the flood. The flood resulted primarily from two factors which did not exist, at least in conjunction, in previous years; one the unusual heavy rainfall period above mentioned, with resulting heavy runoff, and the other the fact that the reservoir was already full, rather than nearly ten feet below spillway, as was usually the case on September 30th.

Claimants contend, however, that, while perhaps the mere removal of the dam would not have mitigated the flood, nevertheless, it would not have occurred had the State never erected the dam and made the other changes in the area above the dam which have been above mentioned. Learned experts argued that the wooded areas, small highway culverts, canal aqueducts, lower bridges, and other structures and conditions which existed prior to the erection of the dam and reservoir would so have retarded the rainfall runoff that the river would not have reached flood elevation at Rome. We do not doubt that these various former conditions did have some retarding influence, but we very much doubt that they would have reduced the rate of flow on October 2, 1945, by the several thousand cubic feet per second which would have been necessary to reduce the runoff and consequent flow down the river (there being no dam to arrest it) to less than the 8,560 cubic feet per second which did flow and did flood claimants' premises.

There remains the question whether the dam was erected in part for flood control purposes, or, if it was not originally so erected, whether the State by representation and a course of conduct assumed a duty to operate it with due regard to flood prevention.

We find nothing in the Barge Canal Act concerning flood control. Prior to the adoption of that act, however, the Legislature had directed a general study and survey of the proposed Barge Canal system. The result was the submission of the elaborate '' Report on the Barge Canal '', dated February 12, 1901, by Edward A. Bond, State Engineer and Surveyor, which provided the basis for the subsequent enactment of the Barge Canal Act. That report, commenting on the proposed dams at Delta and elsewhere, and on floods in the Mohawk River, said, '' The contemplated storage dams would have a very beneficial effect in checking these floods.''

Between February, 1908, and January, 1919, the State Engineer and Surveyor published a monthly pamphlet, known as the Barge Canal Bulletin, which was a sort of progress report on the construction of the canal. In the bulletin of December, 1908, in connection with a discussion of the plans for Delta and Hinckley dams, we find the following statement: '' The capacity of these reservoirs is so great that they are expected to have a beneficial effect upon the floods of the Mohawk Valley.'' The same issue, describing new methods of treatment developed in the study of the canal construction problems, says, '' Among these may be mentioned a means of determining the regulation of floods afforded by a reservoir.''

The October, 1909, issue, discussing Delta Dam specifically, goes further: '' A gate-house, east of the spillway, is to be constructed and provided with four 60-inch cast iron discharge pipes, having a combined capacity of about 3,800 cubic feet per second, with water in the reservoir standing at the crest of the dam. The governing requirements in designing these pipes was to provide a sufficient discharging capacity to regulate the flow, in time of summer floods, to a maximum of 2,500 cubic feet per second, it being estimated that about 500 cubic feet per second might pass into the river between the dam and the point where the river will enter the Barge Canal, and 3,000 cubic feet per second being considered the maximum rate of flow which should be allowed to pass into the canal at Rome during the navigation season * * * The reservoir will be of great value in regulating the flow of the stream below the dam. The present low-water flow is from 100 to 150 cubic feet per second and the maximum flood discharge of which we have record is about 8,200 cubic feet per second. It is estimated that, when the dam has been constructed and the gates are properly regulated, the reservoir will limit all summer floods to a maximum rate of 2,500 cubic feet per second and winter floods to about 2,600 cubic feet

per second, it being assumed that the reservoir will be kept practically empty during the winter months. However, in case of a misregulation of the gates of the reservoir, the maximum flood which could pass over the dam would be about 5,600 cubic feet per second, as compared with 8,200 cubic feet per second — the amount at present, before the reservoir is constructed. This regulation will undoubtedly save considerable damage to property, not only by affording a more uniform regimen of flow, but by reducing flood heights, withholding ice and preventing ice jams and gorges.''

Again in the August 10, 1910, bulletin: '' At the same time, while preserving the low water flow in the Mohawk River, it reduces the greatest floods immediately below the dam, in case of proper regulation to less than one-third their former volume, and withholding great masses of snow and ice, it should mitigate the disastrous flood conditions in the lower Mohawk Valley.''

The State dismisses the Barge Canal Bulletin as mere advertising, designed to sell the Barge Canal program to the public. We are unable to take so casual an attitude. It was published by authority of the State official charged with the responsibility for designing, constructing and operating the canal system and the statements contained therein were representations of the purposes, expectations and achievements of the enterprise. One of these representations was that Delta Dam would aid in controlling floods.

After the construction of the dam the State continued to proclaim its value in flood control. The Barge Canal Bulletin of July, 1913, stated '' During the unprecedented flood of last March, this reservoir stored the waters of the upper Mohawk so that there were no flood conditions above the junction of the West Canada Creek, and Rome and Utica and the nearby villages experienced no inconvenience.''

The 1924 annual report of the State Engineer and Surveyor commented, '' Not only is it necessary to have a sufficient supply of water on hand at all times to maintain the canal pools at proper grade but also it is essential that the reservoirs and lakes in the supply system be so regulated as to have room for storing flood waters, thus lessening flood conditions as much as possible.''

The 1947 report of the Superintendent of Public Works (made, of course, subsequent to the 1945 flood) stated, '' Back of the facilities of adequate water supply and ranking with the obvious purpose of the canals in importance is another feature of this

great inland water system that was strikingly demonstrated in the early part of the 1947 season. That feature is flood control.''

Having represented, first, that the dam would, and, later, that it did, alleviate flood conditions, the State became obliged, we feel, to pursue a policy calculated to accomplish such benefit so far as reasonably possible.

The Delta Reservoir is, of course, more than a mere place of storage for water. It is a regulating reservoir, was so intended, and has at all times been so used. By control of the amount of water permitted to flow down the Mohawk River channel the State has regulated both the summit level of the Barge Canal and the amount of flow in the lower Mohawk, particularly in the vicinity of Little Falls. One of the reasons given by the State for holding back so much water in September was to avoid or relieve flood conditions at Little Falls. This was flood control. The question, it seems to us, was no longer whether the dam was designed, or could be used, for flood control but simply where, when and how the control was or should have been exercised.

Further, whether intentionally or not, the State did control the flood situation at Rome up until 1945, by its practice of keeping the water level several feet below the height of the spillway. Had the same situation prevailed in 1945, it is extremely unlikely that there would have been a flood at Dominick Street in Rome.

It is our conclusion, therefore, that both by original representation and by a long continued course of conduct the State did undertake to regulate Delta Dam with a reasonable regard to flood prevention. If, then, the State was negligent in such operation in 1945, taking into consideration all of the various factors involved in the operation, and if such negligence was the cause of the flood of October 2d, the State must be held responsible.

It is undisputed that the reservoir was full and overflowing during most of 1945. No serious effort seems to have been made to reduce the water level. From April 3d to June 28th the discharge gates remained closed. Between June 28th and September 16th one gate was open from eight to fifteen inches of a possible forty-eight inches, the other three gates remaining closed. On September 16th, one gate was fully opened and on the next two days two gates were open. All were closed between September 19th and 21st, after which first one and then two were opened, but all were again closed between September 26th and September 29th. One was then opened but closed again October 1st.

With the spillway overflowing the State's control was severely limited. It could increase the flow into the canal by opening gates, but it could not decrease it. In the event of further rain it was helpless, no matter how great the need for curtailment of flow both in the canal and in the river. In our opinion such a method, or lack of method, of operation was negligent, unless in some manner justified because of particular circumstances.

The State offers several justifications. First, it maintains that because of the heavy rainfall in 1945, it simply had more water on its hands than it could handle. Despite this surplus, however, the State nevertheless continued, at least until September 15th, to divert additional water from the Black River into the Delta Reservoir at rates exceeding 50 cubic feet per second, and from Hinckley Reservoir into the summit level of the canal at rates considerably in excess of 100 cubic feet per second. Finally, despite the above-average rainfall, it retained so much water behind the dam that the flow in the Mohawk River channel in July, was below the average for the preceding ten years, was only a little above such average in August, and about average during the first half of September. These procedures are simply not consistent with a claim that there was too much water.

The State further argues that it had to store water in anticipation of a possible shortage in the fall, earlier rainfall having been above average. This flies in the face of records showing that the heaviest rainfall in the area always came in late summer and fall. It also overlooks the fact that the need for a water reserve decreases as the end of the navigation season approaches and that actually the amount of water in Delta Reservoir, if not replenished from any source, was sufficient to maintain canal navigation for at least two months. In 1925, Delta Reservoir was empty all year, while the dam was under repair, and Barge Canal navigation proceeded satisfactorily. As a matter of fact, Barge Canal traffic proved so much lighter than originally anticipated that there has never been any real need for all of the available water. It rarely exceeded 5,000,000 tons and in 1944, had declined to 2,506,840 tons.

Third, the State further justifies its action on the ground that water had to be held back in order to prevent flood conditions at Little Falls. A review of the record shows that except for two days in May, and three days in September, the water level at Little Falls was well below flood stage and that considerably more water could have been discharged from Delta Reservoir without producing a flood. It also appears that at least 1,000 cubic feet per second can be discharged from the dam without interference with navigation on the summit level.

Finally, and this is probably the true explanation of the high level operation in August, and September, the State points out that between August 28th and September 15th the Nine-Mile Creek spillway was under repair and that it was necessary to hold the canal level down in order to facilitate the repair work. Unquestionably this was a complication but it is one which could have been anticipated. Maintenance of the water above spillway elevation right up until August 14th was scarcely good preparation for the repair work. Having maneuvered itself into the situation, the State simply had to choose between the risk of damage to the repair work and a possible flood in Rome, and it evidently elected to risk the flood.

There is another possible explanation, which the State naturally does not mention. The engineer in charge of the dam operation was a director of the yacht club at Delta Lake. He was under almost continual pressure from the club members to maintain the reservoir at a high level in order to facilitate the club's program of yacht races. There is no direct proof that he yielded to this pressure, but it seems very likely that it had some influence on him. It is perhaps of some significance that on the whole Delta Lake was operated at a somewhat higher level in the years following 1939, than previously.

We can not escape the conclusion that the high level operation of the reservoir during 1945, was unnecessary and negligent. We recognize that there were complications in September but the September situation can not be isolated; it was in part at least a result of the improper regulation in preceding months.

The substance of the whole matter is that the State, in order to supply water for an artificial waterway, assumed complete control of the flow of the Mohawk River, representing in effect that such control would have a beneficial effect on flood conditions. For some thirty years this control was so managed that there were in fact no floods. Then in 1945, the State unnecessarily abandoned or lost control of the situation, and a flood ensued. We feel that the State is responsible.

We have thus far made no reference to the various cases to which our attention has been directed because we feel that the great majority of them have little relevance to the situation here presented. We do, however, feel that *Jacobson* v. *State of New York* (140 Misc. 306), *Adirondack Power & Light Corp.* v. *City of Little Falls* (148 Misc. 191) and *Moltion* v. *State of New York* (193 Misc. 850) support generally the conclusion we have reached.

In the *Jacobson* case the State permitted the gates in a dam to remain nearly closed, allowing little water to flow in the river channel below, during a month of exceptional rainfall, and resulting ultimately in a flood when the impounded waters were released. The court held the State negligent for not drawing the water down during the month. In the *Adirondack Power & Light* case the court said (p. 195), " Every riparian owner has the right to have the water of a stream flow past his premises in the stream as it is wont to flow, without diminution and without increase of the natural flow or obstruction thereto ", a statement which bears generally on the responsibility of the State arising from its action in interfering with the natural flow of the Mohawk. In the *Moltion* case (*supra*), we stated the principle that if the State, in the operation of the Barge Canal, causes damage to the property of others, it is liable therefor.

In addition to the foregoing cases, we also cite *Eaves* v. *City of Ottumwa* (38 N. W. 2d 761, 765–766 [Iowa]), wherein failure to open certain floodgates caused flooding of plaintiff's premises. Defendant contended that it would not be liable if the plaintiff's premises in their natural condition would have been overflowed before the construction of any dams, race or levees. The court rejected this contention, saying, " Defendant could not relieve itself from liability to plaintiffs for the direct consequences of its negligent operation of the plant on the theory that if conditions had remained as they were some 68 years previously the river would have overflowed plaintiffs' property. * * * Defendant was required to exercise due care in operating its plant under the conditions as they existed in May, 1944, and not prior to 1875. In determining whether defendant was negligent in failing to open the gates plaintiffs were in effect entitled to whatever protection the improvements made by the city and its predecessors afforded their property."

The claimants are entitled to recover from the State of New York the sum of $3,000.

The foregoing constitutes our written and signed decision herein. (Civ. Prac. Act, § 440.)

Let judgment be entered accordingly.